IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: CAESARS ENTERTAINMENT OPERATING COMPANY, INC., ET AL., <br><br> Debtors. | ) ) ) ) ) ) | |
| CAESARS ENTERTAINMENT OPERATING COMPANY, INC. et al., <br><br> Plaintiffs-Appellants, <br> v. <br><br> BOKF, N.A., WILMINGTON SAVINGS FUND SOCIETY, FSB, MEEHANCOMBS GLOBAL CREDIT OPPORTUNITIES MASTER FUND, LP, RELATIVE VALUE-LONG/SHORT DEBT PORTFOLIO, a Series of Underlying Funds Trust, SB 4 CF LLC, CFIP ULTRA MASTER FUND, LTD., TRILOGY PORTFOLIO COMPANY, LLC, and FREDRICK BARTON DANNER, <br><br> Defendants-Appellees. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | No. 15 C 6504 <br><br> Judge Robert W. Gettleman <br><br> Chapter 11 Case No. 15-01145 <br> Adversary Proceeding No. 15-100149 |

## MEMORANDUM OPINION AND ORDER

Caesars Entertainment Operating Company, Inc. ("CEOC") and approximately 170 of its subsidiaries ("Debtors") appeal from the decision of the bankruptcy court in Adversary Action 15 A 149, <u>In re Caesars Entertainment Operating Co, Inc.</u>, 533 B.R. 714 (B.K. N.D. Ill. 2015). In that decision, the court denied Debtors' request for a preliminary injunction under § 105(a) of the Bankruptcy Code, 11 U.S.C. § 105(a), by which Debtors sought to enjoin defendants BOKF, N.A., Wilmington Savings Fund Society, FSB ("Wilmington"), MeehanCombs Global Credit Opportunities Master Fund, LP, Relative Value-Long/Short Debt Portfolio, a Series of Underlying Funds Trust, SB 4 CF LLC, CFIP Ultra Masters Fund, Ltd., Trilogy Portfolio

Company, LLC, ("MeehanCombs"), and Fredrick Barton Danner ("Danner"), from pursuing civil actions against CEOC's non-debtor parent, Caesars Entertainment Corp. ("CEC") pending in the Delaware Court of Chancery and the Souther District of New York. For the reasons described below, the decision of the bankruptcy court is affirmed.

## BACKGROUND[1]

Debtors are the primary operating units of a larger groups of companies described as "the Caesars Gaming Enterprise ("Caesars")." CEOC is the debtor in the lead case[2], the other debtors are all subsidiaries of CEOC. CEC is majority owner of CEOC. Caesars owns, operates or manages 50 casinos in five countries including the United States. It has 68,000 employees, 3 million square feet of gaming space, and 39,000 hotel rooms. Debtors own, manage, or operate 38 of the casinos. In its most recent fiscal year Caesars had revenues in excess of $8 billions, of which Debtors contributed over $5 billion.

In September 2005, CEOC and CEC entered into an indenture with U.S. Bank N.A. as indenture trustee (the "2005 Indenture"). Pursuant to the 2005 Indenture, CEOC issued $750 million in notes due in 2017 with an interest rate of 5.75% (the "2017 notes"). In June 2006, CEOC entered into a second indenture with US Bank as indenture trustee (the "2006 Indenture") pursuant to which CEOC issued another $750 million in notes due in 2016 (the "2016 notes") with 6.5% interest. The 2016 and 2017 notes (jointly the "Senior Unsecured Notes") were unsecured, but CEC guaranteed CEOC's obligations under the Indentures and notes. Defendant

---

[1]The background facts are taken from sections of the bankruptcy court's findings of facts and conclusions of law to which neither party has objected.

[2]The underlying bankruptcy proceeding, 15 B 1145, is a set of jointly administered Chapter 11 actions.

2

MeehanCombs holds $15,318,000 of the 2016 notes and $5,623,000 of the 2017 notes. Defendant Danner holds $104,000,000 of the 2016 notes.

In 2008, affiliates of Apollo Global Management, LLC ("Apollo") and TPG Capital LP ("TPG") and other investors acquired CEC (and all of its subsidiaries) in a $30.7 billion leverage buyout. The investors paid $6.1 billion in cash with the remainder funded through the issuance of approximately $24 billion in debt. Of the $24 billion, $19.7 billion was secured by liens on substantially all of Debtors' assets.

In 2009, CEOC and CEC entered into a third indenture with U.S. Bank as indenture trustee (the "2009 Indenture") under which CEOC issued $3.71 billion in notes due in 2018 with interest at 10%. The notes were secured by second priority liens on, among other things, substantially all of CEOC's assets. In 2010 CEOC and CEC entered into a fourth indenture with U.S. Bank as trustee under which CEOC issued $750 million due in 2018 with interest at 12.75%. CEOC's obligations under the notes were secured in part by second priority liens on substantially all of its assets. CEC guaranteed CEOC's obligations under the 2009 and 2010 Indenture and under the 2018 Notes (jointly the "Second Lien Notes"). Defendant Wilmington succeeded U.S. Bank as Indenture Trustee under the 2009 Indenture. Defendant BOKF succeeded U.S. Bank under the 2010 Indenture.

Around 2009, as a result of the 2008 financial crisis, Caesars sought to "restructure and manage" CEOC's debt. Caesars engaged in a series of over 45 "capital market transactions, including "assets sales, exchange and tender offers, debt repurchases and refinances." (The "Disputed Transactions"). Debtors describe these transactions as designed to "extend debt

maturities, meet interest obligations, monetize assets and transfer debt in capital expenditure obligations at properties CEOC could not afford to invest in."

Prior to the Disputed Transactions, CEC was a holding company with its sole asset consisting of 100% of CEOC. At the time it guaranteed both the Senior Unsecured Notes and the Second Lien Notes it possessed nothing but the equity in CEOC. It is only as a result of the Disputed Transactions that CEC obtained assets beyond its ownership interest in CEOC.

CEOC's creditors understandably take a dim view of the Disputed Transactions, considering them to be part of a "carefully orchestrated plan to strip CEOC of valuable assets," moving them beyond the creditors' reach. According to the creditors, the plan created a "Good Caesars" consisting of CEC and its affiliates holding prime assets that once belonged to CEOC, and "Bad Caesars," consisting of CEOC left with barely profitable or unprofitable properties and burdened with debt left from the 2008 leveraged buyout.

Two of the Disputed Transactions are particularly relevant to the instant dispute, because they led to the lawsuits that Debtors seek to enjoin. The first such transaction, referred to by the parties as the B-7 Refinancing, occurred in May 2014 when CEC and CEOC had CEOC amended its first lien credit agreement and obtain an additional $1.75 billion in new term loans. As part of that transaction, CEC sold 68.1 shares, or 5%, of CEOC common stock for $6.15 million to institutional investors not affiliated with CEC. Based on this sale, CEC took the position that because CEOC was no longer a wholly-owned subsidiary, CEC's guarantees of CEOC's obligations under the First and Second Lien Notes were terminated.

The second Disputed Transaction, referred to as the "Senior Unsecured Notes Transaction," occurred on August 12, 2014, when CEC and CEOC consummated a deal with certain holders of more than 51% of CEOC's outstanding Senior Unsecured Notes. CEC and CEOC repurchased $155.4 million of the Notes, with each paying $77.7 million plus accrued and unpaid interest. The selling noteholders agreed to support any future restructuring that had consent of at least 10% of outstanding noteholders. They also entered into a supplemental indenture that, among other things, removed CEC's guarantee of the Senior Unsecured Notes.

CEC's attempts to extinguish its guarantees of CEOC's obligations under both the Second Lien Notes and the Senior Unsecured Notes led to the four actions Debtors seek to enjoin. In each of those four actions, the plaintiff (defendants in the instant case) sought, among other things: (1) a declaration that CEC's efforts to effect a release of its guarantee is void; and (2) to enforce the respective guarantee. First, on August 4, 2014, Wilmington sued CEC, CEOC and others in the Delaware Court of Chancery, claiming, among other things, that the B-7 Refinancing breached the 2009 Indenture, and seeking a declaration that CEC's guarantee of the notes subject to the Indenture had not been released. Next, on September 3, 2014, MeehanCombs sued CEC and CEOC in the Southern District of New York raising eight claims based on the Senior Unsecured Notes Transaction. The suit seeks a declaration that CEC's guarantees of the 2005 and 2006 Indentures are still in effect, damages under the Trust Indenture Act, 15 U.S.C. §§ 77aaa-bbb, and damages for breach of the Indentures and guarantees.

One month later, on October 2, 2014, Danner filed a five count class action complaint against CEC and CEOC in the Southern District of New York. All counts contest the Senior Unsecured Notes Transaction. Danner seeks a declaration that the original 2006 Indenture

remains in effect and that the supplemental indenture and its release of the guarantee is void, and damages for breach of the 2006 Indenture. Finally, in March 2015, BOKF sued CEC in the Southern District of New York claiming that CEC breached the guarantee and 2010 Indenture, and that the release of the guarantee in the B-7 Refinancing is void.

In June 2014, just before Wilmington filed the first suit, CEOC appointed two independent directors as a Special Governance Committee ("SGC") tasked with investigating the Disputed Transactions to determine whether Debtors or their creditors or both have claims against CEC. The SGC investigation has taken thousands of hours. Although still ongoing, the SGC has apparently found that CEOC has substantial claims against CEC arising out of the Disputed Transactions, including claims for avoidable preferences and fraudulent transfers. It has not identified any specific claims or the transactions out of which they arise.

At the same time the SGC began its investigation, Debtors began negotiating with CEOC's first lien creditors and CEC over terms of a possible restructuring. On December 19, 2014, Debtors, CEC and some of the CEOC first lien note holders entered into a "Restructuring Support and Foreclosure Agreement" ("RSA"). In the RSA, CEC agreed to make a financial contribution to Debtors' restructuring. In exchange, CEOC agreed that the plan of reorganization would provide for a release of all claims the estates had against CEC, its affiliates, shareholders, officers, directors and others. The RSA would release CEC from more than $12 billion in note holder guarantee claims.

On January 12, 2015, three second lien noteholders filed an involuntary petition against CEOC in the District of Delaware. Three days later, January 15, 2015, Debtors filed voluntary Chapter 11 petitions in this district. The Delaware court transferred the involuntary case to this

district. On March 11, 2015, one week after BOKF filed the last of the four actions against CEC, Debtors filed the instant adversary action seeking, among other things, an injunction against defendants from prosecuting their guarantee claims against the "non-debtor affiliates." After an evidentiary hearing, the bankruptcy court denied Debtors' request for an injunction, concluding that "debtors have not demonstrated that the claims the estates have against CEC arise out of the same acts as the guaranty claims the defendants are pursuing against CEC in Delaware and New York." Caesars, 533 B.R. at 727.

## DISCUSSION

This court has jurisdiction to hear appeals from final orders of the bankruptcy court. 28 U.S.C. § 158(a)(1). The court reviews the denial of an injunction for an abuse of discretion. See In re Rimsat, Ltd., 212 F.3d 1039, 1049 (7th Cir. 2000); In re Brittwood Creek, LLC, 450 B.R. 769, 744 (N.D. Ill. 2011). A trial court abuses its discretion when "it commits an error of law or makes a clearly erroneous finding of fact." Kress v. CCA of Tenn., LLC, 694 F.3d 890, 892 (7th Cir. 2012). Under this standard, this court should reverse "only where no reasonable person could take the view adopted by the [bankruptcy] court." Bedrossian v. Northwestern Memorial Hospital, 409 F.3d 840, 845 (7th Cir. 2005).

Debtors seek an injunction under § 105(a) of the Bankruptcy Code, which provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions this Title." 11 U.S.C. § 105(a). The statute permits a bankruptcy court to protect its jurisdiction by enjoining the prosecution of a third party's action against a non-debtor pending in another court. In re Teknek, LLC, 563 F.3d 639, 648 (7th Cir. 2009); Fisher v. Apostolou, 155 F.3d 876, 882 (7th Cir. 1998). This power to enjoin third party proceedings is

7

not limited to actions in which the third party seeks to prosecute claims that belong to the estate. "The jurisdiction of the bankruptcy court to stay actions in other courts extends beyond claims by and against the debtor, to include suits to which the debtor need not be a party but which may affect the amount of property in the bankrupt estate, or the allocation of property among creditors." Teknek, 563 F.3d at 648 (internal quotations omitted). The bankruptcy court's authority to enjoin actions under § 105(a) is not absolute, however, and when, as in the instant case, the third parties are asserting individual personal claims (as opposed to general claims that belong to the corporate debtor,) the court may enjoin prosecution only of claims that are sufficiently "related to" claims brought on behalf of the estate in the bankruptcy case. Id. (citing Fisher, 155 F.3d at 882).

In the instant case, the bankruptcy court determined that defendants' guarantee claims against CEOC are not sufficiently related to CEOC's potential (and as yet unidentified) claims against CEC to authorize an injunction. The court analyzed the Seventh Circuit's decisions in Fisher and Teknek, and concluded that individually and together they stand for the proposition that to be enjoined, the third parties' claims must arise out of the same acts as the estates' claims. Concluding that the third parties' breach of guarantee claims against CEC do not arise out of the same acts as CEOC's potential claims against CEC, it denied the requested injunction.

Debtors' argue that the Seventh Circuit precedent does not require the claims to arise from the "same acts," and that bankruptcy courts have the authority to enjoin any third party action that threatens the bankrupt estate. Next, they argue that even if the "same acts" requirement is the law in the Seventh Circuit, defendants' guarantee claims and CEOC's claims

8

against CEC all "arise from the same capital market transactions involving debtors and their debt."

It is not difficult to understand why the bankruptcy court held as it did. Although different factually, the Seventh Circuit's decisions in Fisher and Teknek focused on whether the third party claims against the non-debtor depended on the non-debtor's misconduct with respect to the corporate debtor. Teknek, 563 F.3d at 649. In Fisher, a Chapter 7 case, the corporate debtor was a commodities business that the individual debtor and his accomplices used as a "bucket shop" similar to a Ponzi scheme. After the fraud was discovered both the individual and the corporation were forced into bankruptcy. The corporate trustee brought claims against the non-debtor accomplices to recover on behalf of the estate, and a group of corporate investors sought to bring separate (outside the bankruptcy) securities, commodities and common law fraud claims against those same accomplices. The trustee filed an adversary action seeking to enjoin prosecution of the investors' claims because the estate had its own fraud claims against the investors. The bankruptcy court granted the injunction, but the district court reversed, concluding that the investors' claims were not the property of the estate. Fisher, 155 F.3d at 878-79.

The Seventh Circuit agreed with the district court that the investors' individual fraud claims (as opposed to claims that arose out of the investors' transactions with the corporation) were not property of the estate, id. at 881, but nonetheless upheld the bankruptcy court's injunction because the fraud claims were sufficiently related to the estate's claims. Id. at 882. In reaching this decision the court stated that "it is difficult to imagine how those claims could be more closely 'related to' it. They are claims to the same limited pool of money, in possession of

9

the same defendants, as a result of the same acts, performed by the same individuals, as part of the same conspiracy." Id. Thus, the court could "think of no hypothetical change to this case which would bring it closer to a 'property of' without converting it into one." Id.

In Teknek, another Chapter 7 case, Systems Divisions, Inc., ("SDI") obtained a judgment for patent infringement against Teknek, LLC ("Teknek") and a related corporation, Teknek Electronics ("Electronics"). While the infringement action was pending, Teknek's and Electronic's shareholders looted those two corporations, transferring their assets to Teknek Holdings ("Holdings"). The infringement court then added Holdings and the shareholders as alter egos and entered judgment against them directly. Teknek, 563 F.3d at 642.

Teknek filed for bankruptcy, but Electronics did not. The trustee brought an adversary action against the shareholders, seeking to hold them liable to the estate for the SDI judgment. At the same time, SDI was seeking to enforce its judgment against the same shareholders and Holdings. The bankruptcy court preliminarily enjoined SDI from collecting its judgment outside of the bankruptcy, concluding that SDI's claims against the alter egos were "property of the estate," giving the trustee exclusive right to bring the claims. The district court disagreed, finding that SDI's claims against the alter egos were neither property of the estate nor sufficiently related to the bankruptcy proceeding to warrant an injunction under § 105(a). The court vacated the preliminary injunction. Teknek, 563 F.3d at 641-2.

The Seventh Circuit affirmed the district court. After first concluding that SDI's claims against the alter egos were not property of the estate, the court turned to whether SDI's claims were sufficiently "related to" the estate's claims to warrant an injunction. In holding that they were not, the court distinguished both Fisher and Koch Ref. v. Farmers Union Cent. Exch., Inc.,

10

831 F.2d 1339 (7th Cir. 1987), a case which discusses the differences between general claims of the estate, and individual or personal claims of creditors:

> In both of these cases, the creditors' claims against the non-debtor fiduciaries depended on the non-debtors' misconduct <u>with respect to the corporate debtor</u> . . . . In this regard general claims and claims that are 'related to' the bankruptcy seemingly always involve transfers from the debtor to a non-debtor control person or entity.

<u>Teknek</u>, 563 F.3d at 649 (emphasis in original).

After acknowledging that the case involved such facts, the court then noted that Electronics was a separate non-debtor that was directly liable to SDI without regard to the debtors' liability. "SDI's claim against the alter egos does not depend on the alter egos' misconduct with respect to the debtor [Teknek]. SDI has equal recourse against the alter egos because of the injuries suffered by Electronics." <u>Id</u>. Thus, even though SDI's claims against the alter egos had the potential to affect the amount of property in the bankruptcy estate and the allocation of property among creditors, the court refused to enjoin them, stating, <u>id</u>.:

> Here, though SDI's claims involve the same pool of money as the trustee's claims, and that money is in the possession of the same defendants (the alter egos), the claims are not based on the same acts. The alter ego's looted both Teknek and Electronics. Those are separate acts, which cause separate injuries to two separate companies, only one of which is in bankruptcy.

In the instant case, defendants' claims against CEC do not in any way depend on CEC's misconduct with respect to CEOC. Defendants' claims arise out of CEC's failure to honor guarantee agreements entered by CEC well before any of the alleged Disputed Transactions. To be sure, the issue of whether the B 7 Refinancing and the Senior Unsecured Notes Transaction effectively released CEC's guarantee obligations will be litigated in the Delaware and Southern District of New York actions, and may also be litigated in the bankruptcy court. But it is the

defendants' claims that must relate to the debtors' potential claims, not just the issues or defenses involved in the litigation of those claims. See In re Pierport Dev. & Realty, Inc., 502 B.R. 819, 826 (B.K. N.D. Ill. 2013) (It is the conduct that cause the alleged injury, not the particular cause of action or legal theory that determines whether the bankruptcy trustee has standing.").

Here, defendants were allegedly injured by CEC's failure to honor its guarantees. The validity of the two transactions will be raised in the Delaware and New York actions, but the conduct causing defendants' injury is CEC's alleged breach of its contracts. And, in any event, Debtors have admitted at trial that they have no claim against CEC based on either the B 7 Refinancing or the Senior Unsecured Notes Transaction. Their argument that defendants' claims against CEC "arise from the same capital market transactions involving debtors and their debt," is simply wrong.

Thus, under any reading of Fisher and Teknek, it is obvious that whether a third-party's claims against a non-debtor arise out of the same acts as the estate's claims is a key component of the determination of whether a § 105(a) injunction is permitted. Whether it is a requirement for injunctive relief, as the bankruptcy court held, or whether it is simply a key factor that may tip the scale when no other factors mandate an injunction, is an issue that need not be resolved here. In the instant case, as in Teknek, defendants' claims involve the same pool of money as Debtors' claims, and that money is in the possession of the same defendant. The claims are not, however, based on the same acts. No other factors compel, or even support the issuance of an injunction.

Despite the obvious import of Teknek, Debtors continue to argue that § 105 is the "bankruptcy code's equivalent of the All Writs Act," providing the bankruptcy court with broad

12

authority to grant injunctive relief to protect the "integrity of the bankruptcy estate." The flaw in their position crystalized at oral argument when Debtors' counsel indicated that the size of the estate's claim is determinative. "And so if you're talking about something that would be a very small claim of the estate, I'm not sure that the bankruptcy court would necessarily have authority in those circumstances. But certainly it's got to be the case that a bankruptcy court would have the authority when the claim is the only asset of the estate." But, as defendants' counsel pointed out, if that were the test, the Seventh Circuit would have affirmed the injunction in Teknek, in which the estate's claims against the alter egos were it largest, if not only asset. Debtors' response was only to argue that Teknek did not address the propriety of temporarily enjoining lawsuits against a debtor's guarantors by a bankruptcy court, but instead addressed only situations where non-debtors and debtors disagreed over which entity owns a claim.

 Debtors' reading of Teknek is incorrect. The Teknek bankruptcy court did hold that SDI's claims against the alter egos were property of the estate and therefore enjoined SDI from collecting its judgment outside the bankruptcy, but, as the Seventh Circuit made clear, the district court disagreed and held that SDI's claims were not property of the estate and not related to the bankruptcy proceeding. "It therefore ruled that SDI's claims were not subject to the automatic stay under § 362, nor to an injunction under § 105 of the Bankruptcy Code." Teknek, 563 F.3d at 642. The Seventh Circuit affirmed the district court on both points, holding that it had properly vacated the bankruptcy court's injunction. Thus, Teknek squarely addresses the propriety of an injunction under § 105, and demonstrates that something more than the claims simply involving the same pool of assets (even if very large) is needed to authorize the injunction. It is that something more that is missing in the instant case.

Without that something more, the instant case, like Teknek, is more akin to the "common case" where a creditor of a bankrupt corporation files a suit against the bankrupt's insurer or guarantor. Such suits are allowed to proceed because they are "only nominally against the debtor because the only relief sought is against [its] insurer, guarantor, or other similarly situated party." Teknek, 563 F.3d at 649 (quoting Fisher, 155 F.3d at 882-83).

Thus, for the same reason that a suit against a bankrupt's guarantor is not discharged under 11 U.S.C. § 524(e), because a discharge "does not affect the liability of any other entity on the debtor's debt," In re Hendrix, 986 F.2d 195, 197 (7th Cir. 1993), a third party action against a debtor's guarantor is not typically stayed under § 105(a). Consequently, the bankruptcy court's conclusion that Debtors are not entitled to an injunction is not erroneous as a matter of law and is not an abuse of discretion. The decision is affirmed.

## CONCLUSION

For the reasons described above, the decision of the bankruptcy court is affirmed.

**ENTER:** October 6, 2015

_____

**Robert W. Gettleman**
**United States District Judge**