

CERTIFIED COPY

A True Copy
Teste:

Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

In the

# United States Court of Appeals

## For the Seventh Circuit

————————————

No. 15-3259

IN RE CAESARS ENTERTAINMENT OPERATING COMPANY, INC.,
 *et al.*,

*Debtors.*

————————————

CAESARS ENTERTAINMENT OPERATING COMPANY, INC.,
 *et al.*,

*Plaintiffs-Appellants*,

*v.*

BOKF, N.A., *et al.*,

*Defendants-Appellees.*

————————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 15 C 6504 — **Robert W. Gettleman**, *Judge.*

————————————

ARGUED DECEMBER 10, 2015 — DECIDED DECEMBER 23, 2015

————————————

Before POSNER, MANION, and SYKES, *Circuit Judges*.

POSNER, *Circuit Judge*. This is an immense, and immensely complicated, bankruptcy proceeding, but the issue presented by the appeal is straightforward, enabling us to spare the reader a mountain of details. For both the bankruptcy

judge, and the district judge to whom the bankruptcy judge's ruling was unsuccessfully appealed, based their decisions on a question of statutory interpretation. We must decide simply whether their interpretation was correct.

Caesars Entertainment Operating Company, which the parties call CEOC, owns and operates a chain of casinos and is the leading debtor in a Chapter 11 bankruptcy proceeding. It is the only debtor we need discuss because the others are subsidiaries of CEOC. (In other words, to simplify our opinion we pretend that CEOC is the sole debtor.) CEOC used to be wholly owned by Caesars Entertainment Corp. (CEC), which remains its principal owner. Beginning in the mid-2000s and continuing in recent years, CEOC borrowed billions of dollars to finance its operations, issuing notes to the lenders that were guaranteed by CEC. As CEOC's financial position worsened, CEC tried to eliminate its guaranty obligations by selling assets of CEOC to other parties and terminating the guaranties that it had issued. Creditors of CEOC who had received the guaranties challenged CEC's repudiation of them by filing suits in state and federal courts against CEC. The suits sought damages *in toto* of approximately $12 billion. See, e.g., *MeehanCombs Global Credit Opportunities Funds, LP v. Caesars Entertainment Corp.*, 80 F. Supp. 3d 507, 509–11 (S.D.N.Y. 2015); *BOKF, N.A. v. Caesars Entertainment Corp.*, No. 15-CV-1561 (SAS), 2015 WL 5076785, at *2 (S.D.N.Y. Aug. 27, 2015); *Wilmington Savings Fund Society, FSB v. Caesars Entertainment Corp.*, No. CV 10004-VCG, 2015 WL 1306754, at *2–3 (Del. Ch. March 18, 2015). Further complicating the picture, CEOC in its bankruptcy proceeding has asserted claims against CEC alleging that CEC caused CEOC to transfer highly valuable assets to CEC at less than fair value, leaving CEOC saddled with billions of dollars of debt;

the transfers had therefore allegedly been fraudulent trans-
fers—part of a scheme by CEC to snatch CEOC's most valu-
able assets while ensuring that the guaranty plaintiffs could
not recover on their notes.

CEOC fears that those guaranty suits will "thwart[]
[CEOC's] multi-billion-dollar restructuring effort, which de-
pends on a substantial contribution from CEC in settlement
of [CEOC's] claims against it," and thus will "let [the guar-
anty plaintiffs] jump the line in front of other creditors, in-
cluding more senior ones," of the bankrupt estate. CEOC
therefore asked the bankruptcy judge to enjoin the guaranty
suits until 60 days after a bankruptcy examiner, appointed
by the judge to make an independent assessment of the
bankruptcy claims, completes his report. The hope was that
the report might help the parties negotiate a reorganization
of the bankrupt estate. The bankruptcy judge, seconded by
the district judge, to whom CEOC appealed the first judge's
ruling, refused to issue the injunction. The bankruptcy
judge's exercise of jurisdiction over these other suits would
have been constitutional, see *In re Quigley Co., Inc.*, 676 F.3d
45, 52–53 (2d Cir. 2012), but he thought he lacked statutory
authority to enter an injunction under the relevant provision
of the Bankruptcy Code, section 105(a), which provides, so
far as relates to this case, that "the [bankruptcy] court may
issue *any* order, process, or judgment that is necessary or
appropriate to carry out the provisions of this title." 11
U.S.C. § 105(a) (emphasis added). Despite this broad grant of
power, the bankruptcy judge thought that for litigation
against a non-debtor to be enjoinable it must arise out of the
"same acts" of the non-debtor that gave rise to disputes in
the bankruptcy proceeding. The disputes in CEOC's bank-
ruptcy arise out of CEC's alleged fraudulent transfers, while

the claims being pressed against CEC in the lawsuits that CEOC is endeavoring to enjoin arise from CEC's alleged repudiation of the guaranties that it issued to the firms that lent money to CEOC. They are not the same claims. (The guaranty plaintiffs also have claims against CEOC, but those claims are automatically stayed pursuant to 11 U.S.C. § 362(a).)

But nothing in 11 U.S.C. § 105(a) authorizes the limitation on the powers of a bankruptcy judge that CEC's creditors (the guaranty plaintiffs) successfully urged on the judges below. (Notice too that 28 U.S.C. § 1334(b), provides that "the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in *or related to* cases under title 11" (emphasis added).) Though section 105(a) does not give the bankruptcy court carte blanche—the court cannot, for example, take an action prohibited by another provision of the Bankruptcy Code, *Law v. Siegel*, 134 S. Ct. 1188, 1194 (2014); *In re Kmart Corp.*, 359 F.3d 866, 871 (7th Cir. 2004)—it grants the extensive equitable powers that bankruptcy courts need in order to be able to perform their statutory duties.

The question that the bankruptcy judge and the district judge failed to address because of their cramped interpretation of section 105(a) is whether the injunction sought by CEOC is likely to enhance the prospects for a successful resolution of the disputes attending its bankruptcy. If it is, and its denial will thus endanger the success of the bankruptcy proceedings, the grant of the injunction would, in the language of section 105(a), be "appropriate to carry out the provisions" of the Bankruptcy Code, since successful resolution of disputes arising in bankruptcy proceedings is one of the

No. 15-3259                                                              5

Code's central objectives. See *Zerand-Bernal Group, Inc. v. Cox*, 23 F.3d 159, 162–63 (7th Cir. 1994). If before CEOC's bankruptcy is wound up CEC is drained of capital by the lenders' suits to enforce the guaranties that CEC had given them, there will be that much less money for CEOC's creditors to recover in the bankruptcy proceeding. CEOC seeks on behalf of the creditors to recover from CEC assets that CEC caused to be fraudulently transferred to it from CEOC, and to use the recovered assets to pay the creditors. The less capital CEC has for CEOC to recapture through prosecution or settlement of its fraudulent-transfer claims, the less money its creditors will receive in the bankruptcy proceeding. Those creditors, and CEOC as their debtor, thus have a direct and substantial interest in the litigation between CEC and the firms to which it has issued guaranties. That interest would be furthered by a temporary injunction staying the lenders' lawsuits against CEC.

One can envision a situation in which CEC, having both obligations on the guaranties it issued to CEOC's lenders, and obligations to CEOC arising from the latter's fraudulent-transfer claims, would lack the money to satisfy all its obligees, and would thus become the badminton birdie in a contest between the two groups of claimants. CEOC contends that if the guaranty litigation against CEC can be frozen for a time by an order issued by the bankruptcy judge, the bankruptcy examiner's report analyzing the disputed transactions will provide the parties with information they need to have a clear shot at negotiating an overall settlement of what amounts to a three-cornered battle among CEC, its direct creditors via CEC's guaranties to them, and CEOC's creditors, some of whom are also CEC's creditors by virtue of CEC's guaranteeing CEOC's debts.

If this analysis is correct, there is nothing in section 105(a) to bar the order sought by CEOC; for the statute, to repeat, authorizes "any order … that is … appropriate to carry out the provisions of" the Bankruptcy Code. Whether the temporary injunction sought by CEOC is such an "appropriate" order is a factual issue that remains to be determined.

Earlier we questioned the "same acts" limitation that the bankruptcy judge and the district judge placed on section 105(a). But the guaranty plaintiffs (CEC's creditors) argue that two decisions by this court have endorsed that limitation: *Fisher v. Apostolou*, 155 F.3d 876 (7th Cir. 1998), and *In re Teknek, LLC*, 563 F.3d 639 (7th Cir. 2009). The issue in *Fisher* was "whether claims that the defrauded investors have against the accomplices [of the fraudster, whose corporation was in bankruptcy] and against the futures commission merchant through which they conducted much of their business may be stayed for the duration of the [corporation's] bankruptcy proceeding." 155 F.3d at 877. The bankruptcy court stayed (i.e., enjoined) the investors' suits under 11 U.S.C. § 105(a). *Id.* at 878. We approved, saying that

> while the [investor] Plaintiffs' claims are not "property of" the estate [and so were not subject to an automatic stay under 11 U.S.C. § 362], it is difficult to imagine how those claims could be more closely "related to" it [under 28 U.S.C. § 1334(b)]. They are claims to the same limited pool of money, in the possession of the same defendants, as a result of the same acts, performed by the same individuals, as part of the same conspiracy. We can think of no hypothetical change to this case which would bring it closer to a "property of" case without converting it into one.

*Id.* at 882. That was a more clear-cut case for relief under section 105(a) than this one, given that "both parties were pur-

suing the same dollars from the same defendants to redress the same harms." *Id.* at 879. But it doesn't follow that a less clear-cut case is necessarily beyond the reach of section 105(a). In both *Fisher* and the present case the issuance of a temporary injunction against a class of creditors could well facilitate a prompt and orderly wind-up of the bankruptcy.

*Teknek* approves *Fisher*, remarking that in that case "even though the investor-creditors' fraud claims were personal and distinct from claims that could be brought by other creditors, they were so related to the bankruptcy proceeding that, if not temporarily enjoined, they would have derailed those proceedings' efforts to recover for the class of creditors as a whole." 563 F.3d at 648. But *Teknek* in contrast was a case involving "separate acts, which caused separate injuries to two separate companies, only one of which is in bankruptcy." *Id*. at 649. The plaintiff had won a patent-infringement case against two companies—one of which later filed for bankruptcy—and subsequently obtained an enlargement of the judgment to reach shareholders (called "alter egos") of the defendants. The plaintiff claimed that the alter egos had looted the two companies by moving the companies' assets into a holding company in order to avoid having to pay the judgment. The bankruptcy trustee sought to enjoin the plaintiff from enforcing its judgment against the shareholders, arguing that they and the holding company had indeed looted the bankrupt entity; thus the trustee was seeking recovery from the same pool of money as the patent plaintiff. We ruled that the patent claims were not sufficiently related to the debtor's bankruptcy to allow such an injunction to be issued. *Id.* at 649–50. The patent holder's suit had been against both Teknek (the bankrupt company) and a firm called Electronics (the non-bankrupt company).

We noted that the "alter egos [had] looted both Teknek and Electronics[,] … [which were] separate acts, *which caused separate injuries to two separate companies, only one of which is in bankruptcy*." *Id.* at 649 (emphasis added). Because the entire judgment could be collected from the non-bankrupt entity, Electronics, there was no reason to allow Teknek to obtain an injunction that would prevent the patent holder from going after Electronics**.** In the present case, in contrast, the misconduct alleged in the third-party litigation (misconduct by CEC) directly harms the debtor, and concerns transactions that are closely related to, and sometimes overlapping with, those challenged in the bankruptcy.

Furthermore, the patent holder was Teknek's only major creditor, so allowing the third-party action of that creditor to proceed would not affect a larger group of creditors in the bankruptcy. *Id.* at 651. (Indeed we were puzzled why the case was even in bankruptcy, given what was effectively a creditor class consisting of only one creditor. *Id.* at 650. The usual purpose of bankruptcy is to allocate the distribution of the bankrupt's assets among creditors.) In our case the potential injuries to the numerous creditors in the bankruptcy (whose prospects depend on CEOC's assets), and to the guaranty plaintiffs (whose loans CEC has guaranteed), are not readily separable. Both injuries, according to CEOC, stem from CEC's broad scheme to transfer CEOC's assets to itself. Indeed, some of the same creditors have claims against both CEOC and CEC for repayment of the same loans, and so their ability to recover from CEC (the guarantor) may depend on the amount they can recover directly from CEOC, their borrower. And were guarantor liability to be imposed on CEC, CEC's ability to satisfy CEOC's fraudulent-

No. 15-3259                                                    9

conveyance claims against it—and thus pay other credi-tors—would be impaired.

We don't say that the stay sought by CEOC must be granted—that's an issue for the bankruptcy judge to resolve in the first instance—but only that both he and the district judge erred in thinking that section 105(a) as interpreted in *Fisher* and *Teknek* foreclosed such a procedure. That was a misreading of the statute and our cases. The denial of the in-junction sought by CEOC is therefore vacated and the case remanded for further proceedings consistent with this opin-ion.

VACATED AND REMANDED